FREEBORN W. BATHRICK v. THE DETROIT POST & TRIB-
UNE COMPANY.

*Newspaper libel—Evidence in justification—Conversations—Retractions by
other papers—Use of the innuendo—Injury to reputation—Expert
testimony—Publication of judicial proceedings—Damages.*

A person charged with seduction sued for libel. *Held* admissible to
show, as bearing upon the probability of an alleged arrangement
between him and the girl's mother, that she and her mother were
paupers and in extreme poverty and dependence.   (i.)

Where sworn statements, made before a justice, apparently furnish legal
cause for an arrest, but the justice does not issue a warrant, it is
proper, in an action for libel based on a report of the facts stated,
to ask him why he did not issue it.   (ii.)

In a trial for libel based on a charge of seduction it was not clearly error
to exclude the fact that the girl seduced committed suicide just as
the trial was about to take place, and her relations with plaintiff be
investigated.   (iii.)

The substance or effect of a conversation may properly be given in evi-
dence even when the witness cannot remember the exact conversa-
tion itself : and the question in how many conversations between
the witness and one of the parties a certain subject involved was
referred to, is a proper preliminary to an inquiry into the details of
the conversations.   (iv.)

In an action for newspaper libel the editor, on testifying that on hearing
that other papers which had published it had retracted he had
caused inquiries to be made as to the accuracy of the statements it
embodied, should also have been allowed to testify what the result
of those inquiries was.   (v.)

One who sues for libel puts his previous reputation in issue, and defend-
ant can show that even if the charge was false it probably did not
injure him.   (vi.)

The innuendo, in a declaration for libel, is to explain doubtful allusions
in the publication complained of, and is needless when the matter
published is itself disgraceful, and is in clear and unambiguous
terms.   (vi.)

Where a publication complained of in its entirety as a libel charged the
several offenses of seduction, adultery and abortion, which, while
distinct in themselves, were parts of a single and continuous trans-
action, it was *held* that the plaintiff could not, by so using the innu-

endo as to confine his cause of action to the charge of abortion alone, limit the defendants' right to show that plaintiff's previous reputation was such that nothing in the publication could have injured it.   (vi.)

If a plaintiff in a libel suit counts upon a publication as an entirety, he cannot, by confining the innuendo to a portion of it only, limit the defendants' right to justify it as an entirety and show that he had no reputation that would be injured by any part of it.   (vi.)

In showing that the reputation of the plaintiff in a libel suit was such that the charge could not have injured him, the defense is properly confined to the testimony of witnesses who could testify that they knew plaintiff's reputation before the charge was published.   (vii.)

Reputation is what others hear of one's character, and any one can testify to reputation who knows what it was at the time in question. But no one can testify whose knowledge is subsequent and consists of what he has been told the reputation was; for this is hearsay. (vii.)

A physician testifying as an expert that he has discovered no traces of an abortion in a certain case, may properly be asked whether such traces would exist under certain circumstances, even though no proof of such circumstances has been made.   (viii.)

Where statements complained of as libelous were published in several papers besides the one against which suit was brought, and then retracted, it was error to allow the plaintiff to show that the same correspondent gave the information to all the papers, when he was, in no sense, the general representative of any of them and neither was responsible for what he might do except in so far as it adopted his statements and published them.   (ix.)

The publication of judicial proceedings is not privileged to the extent of protecting statements made in connection therewith but drawn from other sources and without stating the judicial conclusion.   (x.)

An absolute charge of crime is not necessarily wanton; and even if not privileged, or if mitigating circumstances are not shown, it does not necessarily carry every element of damages known to the law; as, where the person charged with crime ignores a portion of the charge in basing a libel suit thereon.   (xi.)

Error to the Superior Court of Detroit.   (Chipman, J.) April 26.—June 13.

CASE.   Defendant brings error.   Reversed.

*Henry M. Cheever* and *Geo. V. N. Lothrop* for appellant.   A witness may be examined as to the substance of a

conversation, if he cannot give the words: *Chambers v. Hill* 34 Mich. 523; defendant in a libel suit may show the plaintiff's standing in mitigation of damages: *Larned v. Buffinton* 3 Mass. 546; *Bodwell v. Swan* 3 Pick. 376; *Howe v. Perry* 15 Pick. 506; Odgers on Libel 304; *Stone v. Varney* 7 Met. 86; 1 Greenl. Ev. § 55; 2 Stark. Ev. 876; *Vick v. Whitfield* 2 Hayw. 222; *De Wit v. Greenfield* 5 Ham. 225; *Eastland v. Caldwell* 2 Bibb 21; *Calloway v. Middleton* 2 A. K. Marsh. 372; *Brunson v. Lynde* 1 Root 354; *Austin v. Hanchet* 2 Root 148; *Henry v. Norwood* 4 Watts 347; *Buford v. McLuny* 1 Nott & M'Cord 268; *Sawyer v. Eifert* 2 Nott & M'Cord 511; *Lamos v. Snell* 6 N. H. 413; *Bodwell v. Swan* 3 Pick. 378; *Burke v. Miller* 6 Blackf. 155; *Sayre v. Sayre* 1 Dutch. 235; *Earl of Leicester v. Walter* 2 Campb. 251; *Moor's Case* 1 M. & S. 284; *Newsam v. Carr* 2 Stark. 69; *Foot v. Tracy* 1 Johns. 46; *Springstein v. Field* Anthon 185; *Paddock v. Salisbury* 2 Cow. 811; *Root v. King* 7 Cow. 613; but see *Bush v. Prosser* 11 N. Y. 347; *Fitzgerald v. Stewart* 53 Penn. St. 343; inquiry as to general reputation need not be confined to the period before the alleged act: *Commonwealth v. Sacket* 22 Pick. 394; it is not error to permit questions to be asked before the facts assumed are themselves in evidence: *Hoffman v. Harrington* 44 Mich. 183; hypothetical questions are not erroneous if they contain no assumptions not justified or not to be inferred from the evidence already in; *Daniells v. Aldrich* 42 Mich. 58; *Filer v. New York Central R. R. Co.* 49 N. Y. 42; *Harnett v. Garvey* 66 N. Y. 641; *Guiterman v. Liv., N. Y. & Phil. Steamship Co.* 83 N.Y. 358; *Cowley v. People* 83 N. Y. 464; *People v. Lake* 12 N. Y. 358; *Seymour v. Fellows* 77 N. Y. 178; *Dolz v. Morris* 10 Hun 201; *Hoard v. Peck* 16 Barb. 202; *People v. Thurston* 2 Park. Cr. 49; *United States v. McGlue* 1 Curt. C. C. 1; 1 Whart. Ev. § 452; *Stearns v. Field* 90 N. Y. 640; *Sills v. Brown* 9 C. & P. 601; but see *Fenwick v. Bell* 1 C. & K. 312; the publication of matters that have taken place in Court, is conditionally privileged: Odgers on Libel 243, 251; *McBee v. Fulton* 47 Md. 403; *Lewis v. Levy*

El. Bl. & El. 537; *Rex v. Wright* 8 Term 293 ; *Wason v. Walter* L. R. 4 Q. B. 73 ; and it need not be a verbatim report: *Andrews v. Chapman* 3 C. & K. 289.

*John Atkinson, E. M. Converse* and *Isaac Marston* for appellee.

COOLEY, J.  The plaintiff is a physician practicing at Battle Creek in this State.  The defendant is publisher of a daily paper in the city of Detroit.  In July, 1881, the defendant published in its paper the following article as Battle Creek news :

"The greatest excitement was caused here to-day by the issuing of a warrant for the arrest of Dr. F. W. Bathrick, a wealthy and leading physician of this city, on the charge of abortion on the person of Miss Anna Prosser, a young lady of seventeen.  The facts as embodied in the sworn statement, are these : Miss Anna Prosser is a beautiful young lady, and the only daughter of an English lady.  About one year ago she was taken sick, and Dr. Bathrick was called to attend her professionally.  During his visits to the house, he managed by various promises of large sums of money, houses, etc., to seduce the young lady, who has always borne a pure and spotless character.  After this criminal interviews were frequent, until a few weeks ago, when the girl was discovered to be enceinte, and to cover up the discovery he produced an abortion, in which operation the girl, who is frail and delicate, nearly died.  He never kept his promises to her, and this was the way the matter leaked out, and the officers got hold of it, whereupon they obtained the girl's and the mother's affidavits yesterday, and also the vials containing the medicine he gave her to produce the abortion.  Upon this evidence the warrant was issued.  There does not appear to be the least doubt of his guilt of the triple crime of seduction, adultery and abortion.  The doctor is a married man, and has a large and respectable family of grown up children, and a wife who is nearly heart-broken at this development of her husband's perfidy.  So great has been the excitement over the matter on the street, that threats of tar and feathers have been openly made."

For this publication the present suit was instituted.  The declaration avers in the usual form the previous good standing and reputation of the plaintiff among his fellow-citizens,

the publication of the article with malicious intent to injure him, "thereby meaning and intending to charge and accuse the plaintiff with the crime of willfully causing a woman pregnant with child to abort and miscarry, by giving premature birth to the fœtus or child of which she was pregnant, and that a warrant was issued for the arrest of the plaintiff for the commission of said crime of abortion." The defendant pleaded the general issue with notice justifying in detail the several statements of the published article as true.

I. On the trial the plaintiff proved the publication of the article by defendant, and the extent of the circulation of defendant's paper, and rested. The defense called T. W. Hall as a witness, who testified that he was seventy-seven years of age; that he lived in Battle Creek, was and had for twelve years been a justice of the peace, and for fifteen years a superintendent of the poor; that he had known the plaintiff for fifteen years and Anna Prosser and her mother for ten years. He was then asked: "Will you state what connection you had with the family prior to July 26, 1881; what you had to do with the family of Mrs. Prosser or Anna, officially?" The purpose of the question was explained to be to show that Anna and her mother had been paupers and had received public aid as such, as bearing upon the probability of an arrangement, which they proposed to show, under which, by consent of the mother, the daughter was debauched by the plaintiff for money. The proposed evidence was objected to and excluded. We think it should have been received. Who the woman was, what were her surroundings, what motives were likely under the circumstances to draw her away from the path of rectitude, and whether the plaintiff knew the circumstances and had the opportunity as well as the means to make use of the motives which were likely to control her, were matters in respect to which the jury ought to be as fully informed as possible. The reason is patent. One motive will control under one set of circumstances and another when the facts and surroundings are different; and a jury cannot judge what weight to give to the direct evidence of facts unless they

are permitted to know the circumstances under which the facts are supposed to have occurred. There may be nothing very strange or unnatural in a woman who is in absolute want of the necessaries of life surrendering her virtue for money, when if her needs were abundantly supplied the barter would be altogether incredible. The jury are entitled therefore to have the surroundings shown, and they are without the means of judging intelligently and wisely of such evidence as tends directly to establish the main fact unless the circumstances under which the facts are alleged to have occurred are explained. And surely the extreme poverty and dependence of the woman was a very important circumstance in this case.

II. The witness Hall testified that he went to the house of Mrs. Prosser and took her statement under oath. The statement was put in evidence and is as follows :

"Sworn statement of Anna Prosser.—Dr. Bathrick commenced doctoring my daughter one year ago last January and the agreement was made one year ago last February (the word February should be December, witness testified); and I was sweeping out his office. He asked me the night before New Year's if he should take care of Anna, and he would give her a nice home, a nice house and have it nicely furnished. He then commenced coming to see her and the first time he had intercourse with Anna was on New Year's eve. He took his clothes off and was in bed with her. I cannot say how long he stayed. He came again in two or three nights and went to bed with her again and stayed an hour or two. I usually slept with Anna but on the nights when the doctor came I laid down in another bed. After the second time of intercourse Anna and I went into the country to stay a week with Mr. Pitts in Assyria. Then we came home. The doctor came to our house within a night or two, and went to bed again with her and stayed an hour or two. The doctor gave her money each time, about one dollar. He continued to come and see her, and went to bed with her every time he came, up to the time Anna got in the family way, which was in the month of May. Then I went to see the doctor and told him Anna was in the family way. He said he thought it could not be so, and it should not be so, and he gave me medicine to give her, and I took it home and gave it to her.

It made her very sick and I went down and told him, and he came up to see Anna and she told him the medicine made her very sick.                                    ANNA PROSSER.

Subscribed and sworn to before me this 26th day of July, 1881.                                                    T. W. HALL."

This sworn statement was a part of the preliminary examination which the justice took in this case. There were further oral statements by Mrs. Prosser which were also a part of the examination.    The girl was not at home when it was begun, but came in before it was completed.    The justice gave in detail the statements made to him by Mrs. Prosser on her oral examination, which tended to show that after the plaintiff had continued for a time the illicit intercourse with the daughter, the girl was found to be in a family way, and the plaintiff gave her medicine which made her very sick and she refused to take any more of it, saying it would kill her; that the mother then went to the plaintiff and told him of this, and he gave her some powders, but the girl did not take them, and the medicine she had taken "after a while brought her around;" that the mother believed the girl was in a family way because she missed her monthly periods; and she thought she got rid of a fœtus because "she was very sick and went to the water closet and something passed from her; it might be the return of menstruation; it might be something else." She also detailed promises by the plaintiff to provide for them and furnish them a house, which were made before the illicit relations began.    When an attempt was made to examine the girl she went into hysterics and said "I will die; I won't live;" but a partial examination was had, which confirmed the mother's statements.

It appeared that the justice issued no warrant on this examination, and he was asked by the defense the reason for this.    The question was objected to and ruled out. We think it should have been received.    A legal cause for a warrant was apparently made out, and the failure to issue one would naturally be the subject of conjecture.    If the justice disbelieved the evidence, he might refuse to issue the warrant for that reason, and we do not see why the plaintiff

should not be allowed to prove the fact. But if he had other reasons the defense was equally entitled to the benefit of them.

The justice then produced and put in evidence the formal complaint, which was made after the preliminary examination. The following is a copy of it:

STATE OF MICHIGAN, County of Calhoun, City of Battle Creek, ss. The complaint and examination on oath and in writing of Anna Prosser, taken and made before me, T. W. Hall, a justice of the peace of the city of Battle Creek, in said county, upon the 30th day of July, A. D., 1881, who, being duly sworn, says that heretofore, to wit, on the 31st day of December, A. D. 1880, at the city aforesaid, and in the county aforesaid, Freeborn W. Bathrick of the city of Battle Creek, in the county aforesaid, on the said 31st day of December, 1880, at the city of Battle Creek aforesaid, in the county aforesaid, did seduce and debauch one Anna Prosser, being then and there an unmarried woman, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the people of the State of Michigan, wherefore the said Anna Prosser prays that the said Freeborn W. Bathrick may be apprehended and held to answer this complaint, and further dealt with in relation to the same as law and justice may require.                                              ANNA PROSSER.

Taken, subscribed and sworn to before me the day and year first above written.

T. W. HALL, ·<br>Justice of the Peace.

III. The defence then called Thomas W. Prosser, who testified that he was a brother of the girl Anna, and that she was dead. He was asked how she died, and replied that she jumped into the river. This reply was objected to, and the court struck it out. It was certainly a very noticeable fact if the girl committed suicide just as the relations between herself and the man who was said to have so greatly wronged her were about to be investigated, but the inference connecting the suicide with the investigation would be unsafe and perhaps unjust. We cannot say that any error was committed by this ruling.

IV. Dr. E. B. Weeks of Battle Creek testified to having

a conversation with the plaintiff in relation to his dealings with the Prossers. The plaintiff had brought suit against some of the Chicago papers for publishing the same story about him, and when those suits were about to come to trial witness had said to plaintiff he understood from his counsel that he did not propose to deny his intercourse with the girl. Plaintiff replied that he did not propose to deny that he had intercourse with the girl, but that whatever he got of her he paid her for. The witness gave the details of certain conversations with the plaintiff, and was then asked: "In any of these conversations, or in how many of these conversations, should you think this matter as to the fact of his having had carnal intercourse with her was subject matter of the conversation?" The plaintiff's counsel objected, insisting that the conversations themselves should be given, and the court sustained the objection. We think the court erred. The question was proper as a preliminary to an inquiry respecting the details of the conversations, and was therefore not subject to the objection which was made. But it would have been entirely proper to permit the witness to testify that he had conversations in which the criminal intercourse was admitted or assumed, even though he did not remember the words made use of. It is not surprising that a man should remember the substance or the result of a conversation, and yet not be able to recall the words made use of; and it sometimes casts suspicion upon the veracity of a witness that he assumes to remember the very words of a conversation when there was nothing in the case which was likely to impress upon his mind anything beyond the general result. But if a witness fails to remember words when it would seem that he ought to do so, the jury must be relied upon to give due weight to the fact when considering his evidence.

V. The defence then called William Stocking and proved by him that when the alleged libel was published he was editor-in-chief of defendant's paper; that the article was received from the regular correspondent of the paper at Battle Creek, who had been employed at that point to

gather information for the paper and was paid for what he sent in; that he had been so employed for three or four years and was believed to be reliable and no previous complaint had been made of him; that the article passed through the regular channels in the office, and witness looked it over; that witness was not personally acquainted with plaintiff before, and knew nothing of him. On cross-examination witness was asked whether he did not hear that the Chicago papers which published the same story had afterwards published retractions, and replied that he did. He was further asked if he then published anything, and replied that he did not. On re-examination he stated that after hearing of the Chicago retractions he instituted an inquiry. He was asked what the result was, but this was ruled out. His answer should have been received. If others who published the same story afterwards retracted, an inference that they did so because they had discovered the falsity of the charge would be legitimate. If the managers of the defendant's paper knew of the retractions but failed to make any on their own behalf, the fact was one which called for explanation. Without explanation it might justly be argued that having once committed a wrong, whether inadvertently or by intention, they were determined to persist in it, with reckless disregard of the consequences to the party injured, when others who had committed the same wrong were voluntarily doing what they could to repair the injury. The fact would justly have great weight with the jury; and we cannot doubt that the plaintiff would make the most of it. But the circumstance that retractions were made at Chicago neither proved the innocence of the plaintiff nor by itself could it be receivable in evidence as having any tendency to prove his innocence. The judge very properly allowed it to be shown in the case, and probably considered it a circumstance which called upon defendant to take some action in respect to the charge which it had assisted in giving currency. But it did not follow that defendant ought to retract. A paper is no more bound to retract because others do, than to make charges because

others do; its duty in the one case as in the other, is to investigate the facts and endeavor to give the public accurate information. If it has been deceived or misled into making a false charge of criminal conduct, its managers should be particularly anxious to correct the error as speedily as possible; and whatever tends to cast doubt upon the correctness of the information on which the charge was based, ought to put them upon fresh inquiry. But to retract a charge while believing it well founded, would be pusillanimous as well as mischievous. The public have a right to suppose that the published utterances of respectable journals express the actual views, opinions and beliefs of those who conduct them; and their readers are deceived and misled when the fact is otherwise. All therefore that the Chicago retractions could have made it incumbent upon this defendant to do, was to inquire with care, and with an honest purpose to reach the truth, into all the facts upon which the plaintiff had been arraigned at the bar of public opinion, and to retract its charges without reserve if they were found to be baseless. Whether, therefore, unfavorable deductions could justly be drawn from the silence of the paper after the Chicago retractions, would depend on the results of the investigation which Mr. Stocking instituted, and it was of the first importance that that result should have been disclosed. Silence under the circumstances suggested fault and malice; but the explanation might possibly have been satisfactory and conclusive.

VI. The most important question in the case was, how far the plaintiff's reputation was put in issue by the charge made against him. The published article distinctly charged him with three criminal offences: seduction, adultery and criminal abortion. In his declaration the plaintiff had set out the article at length, *innuendo*, that the defendant in publishing it meant and intended to charge and accuse the plaintiff of criminal abortion. It seems to have been claimed by the plaintiff on the trial, and to have been conceded by the court, that the innuendo narrowed the investigation to the one charge, and that nothing else could be

inquired into but the alleged criminal abortion, and the injury that would be caused to the plaintiff by falsely making that charge. Taking this view of the case the court excluded evidence which was offered by the defendant to show that the general reputation of the plaintiff as a man of chastity was bad, before the article complained of was published.

That this ruling would have been erroneous had not the innuendo limited the alleged meaning of the article to a charge of criminal abortion, is scarcely contested. The plaintiff sues for the injury to his reputation, and if his reputation was bad before in respect to the very matters which are now charged against him, his injury may be little or nothing. He therefore when he brings suit puts his previous reputation in issue, and the defendant may give evidence to show that the alleged libel, even if false, did not probably cause injury. *Earl of Leicester v. Walter* 2 Camp. 251 ; *Clark v. Brown* 116 Mass. 509 ; *Bridgman v. Hopkins* 34 Vt. 532 ; *Steinman v. Mc Williams* 6 Penn. St. 170. In this case the printed article imputes several criminal offenses; but the plaintiff claims that he has put his reputation in issue as to one of them only, because by his innuendo he imputes to the defendant the meaning which charges only that one. This, so far as we know, is making the innuendo perform a new office in pleading. Its usual office is to explain doubtful allusions in the publication; and it becomes necessary when the matter published is of itself disgraceful. *J'Anson v. Stuart* 1 Term 748 ; *Williams v. Gardiner* 1 M. & W. 245 ; *Hoare v. Silverlock* 12 Q. B. 624. " A writing may be so expressed, and in such clear and unambiguous words, as that it may amount of itself to a libel. In such a case, the court wants no circumstances to make it clearer than it is of itself : and therefore, all foreign circumstances introduced upon the record would be only matter of supererogation." *Rex v. Horne* Cowp. 672–683. Such was the case with this publication. It was clear and explicit in its charges of crime, and no innuendo was

needed to explain the words or point their application. They charge, in the most positive terms, seduction, adultery and criminal abortion; but as the plaintiff, for the purposes of this case, has elected to interpret the words as charging the last offense only, he insists that for the purposes of the trial the defendant shall adopt the same interpretation and ignore the other charges altogether. This is his view of the manner in which the innuendoes have narrowed the contention.

It is a very proper rule that where the plaintiff by innuendo imputes to the publication a particular meaning, he will not be at liberty on the trial to reject that meaning and impute another. *Strader v. Snyder* 67 Ill. 404, 413. But this publication means all that is imputed, and also a good deal more. In respect to this further meaning the plaintiff tenders no issue, and apparently claims no damages. But his claim is general that he is damnified by the whole publication, and he puts it before the jury that they may judge from it the extent of his injury. The jury must plainly see that it makes severally damaging charges, and that if the plaintiff is guilty as charged, he is unfit for association with respectable people. The plaintiff ignores some of these charges, neither by his pleading admitting nor denying them, but electing for reasons of his own not to recognize the fact that they are made at all. This, however, does not withdraw them from the consideration of the jury so long as the whole article is before them and damages claimed because of it. There is a sting in every sentence of the article, and the jury must see and feel that, unless it is justified, the whole is atrocious. The plaintiff complains of the whole as an injury to his reputation, but nevertheless proposes that the defendant shall not be suffered to show that as to some portion of the damaging charges he had no reputation which such charge could injure. The obvious reply to this proposition would seem to be that the right of defense must be as broad as the right of attack, and that if he proposed to narrow the controversy to a single charge he should have complained only of that portion of the

article which made it, instead of putting the whole before the jury and counting upon the whole as damaging.

It may be replied, however, and perhaps with truth, that in the published article the several charges were so inseparably connected that it was impossible to count upon any one of them separately, and to select for that purpose the parts of the article which referred to it while excluding the remainder. But this suggests the question whether the three charges of criminal conduct are not substantially one; whether taken together they did not impute one great crime, beginning with the seduction and culminating in criminal abortion; three offenses in law, but all parts of a single transaction, which the plaintiff was alleged to have entered upon to gratify a criminal passion, and to have persisted in until the final culmination in the destruction of the principal evidence against him. And this, we think, is the proper view to take of this publication. It charges in effect one piece of criminal conduct, comprehending three aggravated offenses. Unconnected charges and aspersions have not been raked together with a view to make some give color to the others, but the attack upon the reputation of the plaintiff is single, and could only be satisfactorily investigated as an entirety. The plaintiff counted upon it as an entirety, complaining of it as false, malicious and injurious; and this put upon defendant the necessity of justifying or excusing the whole.

VII. The defense called witnesses to prove that the plaintiff was reputed in Battle Creek to be an abortionist. In this they were restricted by the court to the evidence of parties who could testify that his reputation was known to them before the alleged libel was published. This was correct. An existing reputation is a fact to which any one may testify who knows it; he knows it because he hears it, and what he hears constitutes the reputation. But when one admits that he knew nothing of the reputation of another at a certain antecedent time, he cannot be permitted to say what it was because he cannot know the fact. All he can know is that somebody has told him what the fact was. But that is mere hearsay.

VIII. The plaintiff in rebuttal called Dr. S. S. French, who testified that between July 26 and 30, 1881, he went with Dr. Cox and examined the girl Anna Prosser, and discovered no evidences of abortion. On cross-examination this question was put to him: " Is it not true, as a fact in your experience, that where a woman has a miscarriage or abortion, by the use of medicines, where there is no physical injury inflicted upon the parts, that after the lapse of two or three months, when the monthly periods have resumed their regular course, you could not tell whether they had been brought around by the use of medicines or not?" The question was objected to and ruled out, upon the ground that no evidence had been given tending to establish the facts which the question assumed. But the judge overlooked the fact that the information called for was essential to supply the defects in the testimony the doctor had given. The witness was an expert, and the jury were supposed to be ignorant of the matters respecting which he was testifying. He swore that at a certain time he discovered no evidences of abortion. But this testimony standing by itself had no value for the jury, for the very obvious reason that it did not inform them whether at that time evidences of abortion would have been discoverable if one had taken place. The jury were not suffered to know how this would be, and it was the business of the plaintiff to call out from his expert witness the necessary information. The necessity for making the evidence sufficiently complete was with him and not upon the defense, and but for the danger that the jury might be misled into accepting the naked statement of the witness that he discovered no evidence of abortion as having some tendency to show that none had been committed, the defense might safely have dismissed the witness when the plaintiff did. But it was prudent to guard against that danger.

IX. Mr. Brown, the local correspondent at Battle Creek, who had furnished the article complained of for defendant's paper, was called by the plaintiff to prove that he also furnished the articles for the Chicago papers. This was objected to, but the evidence received. The tendency was to sug-

gest to the jury that the defendant was in some manner responsible for the Chicago publications. But this was an error. Brown was in no sense the general representative of any one of the papers, and neither of them was in any respect responsible for what he might do, except in so far as it might adopt his articles and make them its own by publishing them. Neither of them had any more concern with what Brown might do with or for the others than if it were done by any third person.

X. When this case went to the jury the defendant submitted several requests for instructions, which assumed that the article was privileged, because it related to proceedings in a court of justice, and involved matters which concerned the peace and welfare of the community, and which it was proper should be discussed for the information of the public, and with a view to the formation of a correct and efficient public opinion respecting the facts alleged. The judge did not admit the privilege to the full extent claimed, but instructed the jury in substance that the defendant was privileged to publish what took place before the justice. We think that in this regard the judge conceded all the privilege the defendant was entitled to. The article was not a mere recital of the proceedings which had taken place in a court of justice, and did not purport to be. On the contrary, it brought in other facts supposed to have been gathered elsewhere; and the writer did not await the judicial conclusion and give that to his readers, but assumed himself to be the judge, and to pronounce guilt and suggest a probable punishment unknown to the law. The law has no privilege for such a publication, and the party who makes it should make sure of his facts before doing so. To make a judicial investigation the mere occasion for unfounded sensational charges is not only to do wrong to individuals but to disturb the peace and order of society, and no public considerations sanction, encourage or excuse it. The judge committed no error in this regard.

XI. On the subject of damages the judge, among other things, charged the jury as follows:

"The one remaining question in this case is this : Suppose you come to the conclusion that this article is not privileged, what were the circumstances under which it was written? Of course if this article imputes the crime of abortion to the plaintiff in this case it would carry with it every element of damage known to the law. It will carry actual damages and it will carry those damages to feelings which I think I have had occasion to discuss before you in other cases. Actual damages are such as naturally follow from the fact, the pain, the mortification, the social injury, all that which would follow from the accusation made against a citizen ; and, as I will explain in a minute, you are the judges and the arbiters of that. All this comes under the head of actual damages. Where an accusation of this kind is made, if it is of an atrocious character,—where it imputes crime,—imputes great moral delinquency as well as crime and great personal dishonor,—the law implies that the one who is the object of it will suffer more keenly in his feelings than he would from an ordinary charge, and there will be a feeling of oppression, shame, indignation and mortification, and that that feeling, that mental suffering, will increase in proportion to the enormity and wantonness of the charge. An absolute charge of crime against a man is wanton. It is reckless, and if not privileged, and mitigating circumstances do not appear, as I said before, it carries with it all these elements of damage ; not only the actual damages, but those added damages of pain, mortification, sense of oppression, for all those feelings which would naturally be awakened in the heart of a man who suffered by reason of the attack."

This language, we think, was in some particulars unguarded, and calculated to mislead. An absolute charge of crime against a man is not necessarily wanton, and even if not privileged or mitigating circumstances shown, it does not necessarily carry with it every element of damage known to the law. It may well be doubted if it did so in this case. The plaintiff was charged with serious criminal action. He brought suit, ignoring that part of the charge which imputed the most serious moral turpitude. It was an admissible if not a just inference that he did not deem it wise to put that part of the charge in issue, and the jury would have been justified in regarding the seduction as practically admitted. But if the jury took this view of the

case, they must also have supposed that the disclosure made by the article complained of caused shame, mortification and mental suffering for which the plaintiff was entitled to no compensation from any source. Any one had a right to expose his misconduct, and the fault for the consequent suffering would lie at his own door.

For reasons above given the judgment must be set aside with costs and a new trial ordered.

GRAVES, C. J. and CAMPBELL, J. concurred.