PFISTER, Respondent, vs. MILWAUKEE FREE PRESS COM-
PANY and another, imp., Appellants.

*April 24—June 3, 1909.*

*Libel and slander: Pleading: Privilege: Mitigating circumstances:
Newspapers: Private citizens: Fair criticism: Proper comment:
Publication by other papers: Appeal and error: Harmless error:
Justification: Innuendo: Different meanings: Meaning of the
writer: Instructions to jury: Common knowledge: Notoriety:
Mitigation of damages: Character of plaintiff: Exclusion of evi-
dence: Acts of corporation: Managing editor of newspaper:
Ratification: Exemplary damages: Admissibility of evidence:
Malice: Collateral issues: Testimony taken before grand jury:
Separate causes of action: General verdict, when proper: Neces-
sity of exceptions: Failure to instruct jury: Necessity of re-
quests for instructions: Excessive damages.*

1. Where, in an action against a newspaper company for libel, the
   defendant in its answer claimed the right to discuss public graft
   and kindred questions, and asserted that in the exercise of such
   right, and not otherwise, it published the alleged libelous arti-
   cles, it having specifically pleaded and designated such matters
   as a defense of privilege was bound by its pleading and was not
   authorized thereunder to offer proof of mitigating circum-
   stances.
2. Affirmative proof of mitigating circumstances cannot be given
   in evidence without having been specially pleaded.
3. Where plaintiff had no office, was not a candidate for office, and
   did not belong to any class which by seeking and inviting public-
   patronage renders itself amenable to public comment and criti-
   cism which cannot be rightly applied to a private citizen, a
   defense of "privilege" or "fair criticism and proper comment"
   is not permissible in an action for libel.
4. A false and defamatory publication concerning a private citizen
   is not privileged merely because it may relate to some public
   matter.
5. Although it seems that the defendant may show in mitigation of
   damages that a libelous article was copied from another news-
   paper and published under the belief that it was true, a plea
   that other articles of like tenor and effect were also published
   in other papers does not present that question, and it is not
   error to strike out such allegations of the answer.

6. Where defendant has pleaded the truth as justification for an alleged libel, it is not incumbent upon the plaintiff as part of his case to negative the truth of the charges, but if he sees fit to assume that burden the defendant is not prejudiced.

7. A ruling on evidence in an action for libel that the published articles did not directly charge plaintiff with having committed a crime, but were susceptible of such meaning, and that it was for the jury to say whether or not such was their true meaning, and further that it was not permissible to aver in the answer that plaintiff was guilty of an offense different from that referred to in the complaint and then allege, by innuendo, that the language used in the published article related to the offense set out in the answer, may operate to deprive a defendant of a meritorious defense, and is disapproved.

8. In such case, however, it is only when it is reasonably clear that the language used is susceptible of the meaning attributed to it in the answer and the jury may infer that it was so understood by a considerable number of the readers of the publication that proof under such pleading should be permitted.

9. In an action for libel defendant cannot attribute some hidden meaning to the words used which the readers would not be apt to discover and then proceed to justify on the basis that such meaning is the true one.

10. In libel the meaning intended by the writer is not important, unless such meaning is the natural and obvious one—the meaning that would naturally be conveyed to the readers generally.

11. The office of innuendo is to explain, not to enlarge, the meaning of alleged libelous words.

12. Where a complaint set forth libelous articles several of which did not charge a crime, it is not error to instruct the jury: "To maliciously print and publish of and concerning a man that he has been guilty of a crime is a libel, if the charge is false. It is also a libel to maliciously print and publish false statements concerning a man which tend to degrade or disgrace him or subject him to degradation, contempt, or ridicule."

13. In an action for libel where none of the alleged libelous articles could reasonably have been understood as referring to plaintiff's connection with certain questionable transactions, evidence of public notoriety of such transactions is immaterial and inadmissible as proof of mitigation of damages.

14. In libel defendant cannot mitigate damages by showing specific acts of wrongdoing on the part of plaintiff.

15. In libel evidence of mitigation of damages should be confined to the general bad character of the plaintiff and to legitimate proof tending to disprove malice.

16. Where the record fails to disclose that an item of evidence was offered, error cannot be assigned on its exclusion.

[17. Whether or not the rule that exemplary damages cannot be recovered against the principal for acts of the agent neither authorized nor ratified by the principal should be applied where the malicious act is done by the officer of a corporation intrusted with the management of its business, not determined.]

18. The character of the authority given in the first instance to the managing editor of a newspaper, owned by a corporation, publishing a libelous article, together with the subsequent conduct of the corporation, may be sufficient to support a finding that the malice of which the managing editor was guilty was also attributable to the corporation.

19. In an action for libel it is proper to permit the defendant to testify that he was not actuated by malice or evil intent toward the plaintiff; but it is not error to refuse to permit the examination to proceed further than to allow a direct and explicit denial of malice.

20. Where an alleged libelous article consisted of a statement concerning plaintiff's indictment for alleged larceny, the testimony taken before the grand jury is not admissible to establish plaintiff's guilt, although if it were charged as libelous to say that the grand jury acted on ample evidence, such testimony would be competent to prove that it did so act.

21. While sec. 4021, Stats. (1898), governing libel and slander, provides that a plea of justification, though not maintained by the evidence, shall not of itself be proof of malice, where the defendant pleads the truth in justification, it is not error to instruct the jury that an unsuccessful attempt at justification is a proper circumstance for the jury to consider in determining whether the defendant was actuated by malice. BARNES and SIEBECKER, JJ., are of the opinion that such construction of the statute is too narrow, and that a good-faith but unsuccessful attempt to justify should not be made the basis of aggravating damages, although hesitating to say that such error is of sufficient materiality to warrant a reversal.

22. Where, in an action for libel, nine causes of action were originally pleaded, three discontinued, and proof offered of the remaining six, it is not error to submit the case for a general verdict, provided the jury are properly instructed that all jurors must be agreed to find for the plaintiff as to the existence of each alleged libel before any damages can be assessed on account of the same, and that all must be agreed as to the amount of damages that should be assessed therefor.

23. A judgment will not be reversed for erroneous instructions in the absence of exceptions thereto.

24. A judgment will not be reversed for failure to instruct the jury in the absence of a request in that behalf.

25. Where the amount of the recovery is not such as to indicate passion or prejudice on the part of the jurors, the judgment will not be reversed on the ground of excessive damages.

APPEAL from a judgment of the circuit court for Milwaukee county: S. D. HASTINGS, Judge. *Affirmed.*

This action was brought to recover damages alleged to have been sustained by reason of the publication of a series of alleged libelous articles by the defendant the *Milwaukee Free Press Company* in reference to the plaintiff, and resulted in a verdict for $10,000 compensatory damages and $5,000 punitory damages in favor of the plaintiff. Judgment was entered upon the verdict, and from such judgment this appeal is taken.

Theodore Kronshage, Jr., James K. Ilsley, Howard Greene, James H. Tweedy, and H. A. J. Upham, alleged stockholders, officers, and directors of the *Free Press Company,* were originally named as defendants, but the action was discontinued as to such defendants. The original complaint embraced nine causes of action based upon nine different alleged libelous articles. The third, sixth, and eighth causes of action alleged in the complaint were dismissed before trial.

On August 4, 1905, a grand jury of Milwaukee county returned an indictment against the plaintiff charging him with having committed the crime of larceny as bailee by unlawfully, feloniously, and fraudulently having stolen, carried away, and converted to his own use the sum of $14,000, the property of the Wisconsin Rendering Company, a corporation. The indictment further recited that said sum of money was placed in the hands of the plaintiff by said corporation to be kept, used, and expended by plaintiff for the purpose of obtaining for the corporation a large and valuable contract from the city of Milwaukee for the disposal of garbage, and that

if the money was not so used it was agreed that the same should be returned to the Wisconsin Rendering Company. Upon the return of this indictment the plaintiff issued and furnished to all the newspapers published in Milwaukee a statement denying his guilt and asserting his innocence.    At the time said indictment was returned the Wisconsin Rendering Company was indebted to the First National Bank of the city of Milwaukee in a considerable sum of money, which indebtedness was evidenced by overdue paper, and immediately thereafter the plaintiff purchased such paper from the holder and commenced an action thereon.    In connection with the suit a statement was issued and given to the press by plaintiff's counsel to the effect that if plaintiff was indebted to said Wisconsin Rendering Company it might set up such indebtedness by way of offset or counterclaim and thus determine the question of whether the plaintiff was guilty of conversion or larceny in a civil suit, where the defense interposed might be established by a mere preponderance of evidence.    The alleged libelous articles related mainly, though not entirely, to the aforesaid indictment and to the guilt of the plaintiff of the crime therein charged, or else of the crime of bribery in corruptly using the moneys deposited with him, if the same were not in fact converted by him.

The various causes of action set forth three general classes of charges: (1) The plaintiff was guilty of the crime of larceny as bailee, as charged in the indictment returned against him, or was guilty of the crime of bribing members of the common council with the moneys deposited with him by the Wisconsin Rendering Company for the purpose of procuring a favorable contract for said company with the city of Milwaukee for the disposal of its garbage; (2) the plaintiff purchased a controlling interest in the Milwaukee Sentinel, a newspaper published in the city of Milwaukee, to prevent disclosures damaging to his reputation, which were about to be made in a libel suit he had commenced against that paper

prior to his buying the controlling interest therein; (3) the plaintiff, by buying the outstanding overdue paper of the Wisconsin Rendering Company and bringing suit thereon, was endeavoring to confuse the public and to conceal his guilt by diverting attention therefrom.

The complaint further alleged that the defendant the *Milwaukee Free Press Company* was a corporation engaged in the business of publishing the Milwaukee Free Press, a newspaper having a large circulation in the city of Milwaukee and in the state of Wisconsin; that the defendant *Harry P. Myrick* was the managing editor of said newspaper at the time the alleged libelous articles were published and still is such editor, and as such had the immediate direction and control of all matters published therein, and had and has the active management of the publication of said newspaper; that for many months the said newspaper had pursued a policy of defaming and vilifying plaintiff, and had from day to day caused violent and inflammatory articles to be published of and concerning him, in which it was insinuated that he was guilty of various illegal acts; that such matter was published with the knowledge, acquiescence, and consent of the members of the governing body of the corporation; and that such policy was actuated by malice toward plaintiff and for the purpose of wantonly degrading him in the public esteem and of injuring his reputation and business; that the articles which formed the basis for this action were actuated by the same malicious purpose and were published in execution of it; that plaintiff was a man prominent in the business affairs of the city of Milwaukee, holding many positions of trust and confidence in moneyed, manufacturing, transportation, industrial, and other corporations and enterprises, as well as being the owner of a majority of the stock in the Sentinel Company, and that by reason of the defamatory publications he had suffered damages to his reputation and credit to the amount of $250,000.

Three separate defenses were interposed by the *Milwaukee*

*Free Press Company* to each of the nine causes of action orig-
inally set out in the complaint, and a general plea in mitiga-
tion of damages was interposed as to all of the causes of ac-
tion.    The first defense to the first cause of action set forth in
substance that portions of the article published were omitted
from the first cause of action, and that it was necessary to
read the omitted portions in connection with the portion in-
cluded in the complaint in order to arrive at the true tenor
and meaning of the article, and such omitted portions were
set forth as part of the first defense.    The answer then al-
leged that between July 7, 1897, and February 23, 1898,
there was pending before the board of public works of the
city of Milwaukee, and with the common council of said city,
the matter of disposing of garbage by contract with the lowest
bidder for the period of five years; that said contract involved
the expenditure of more than $250,000; that the Wisconsin
Rendering Company was a bidder on said contract in its
own name, its bid being $368,750; that it was also a bidder
on said contract in the name of Cooper & Burke, such bid
being $300,000; that John J. Crilley and James O'Donnell
jointly bid on the same contract, their bid being $274,500;
that each bid was accompanied by a bond or deposit of
$20,000; that the contract was awarded to Crilley & O'Don-
nell; that thereafter Crilley filed with the city clerk and laid
before the common council a petition purporting to be signed
by Crilley & O'Donnell, asking to be relieved from said bid
and the accompanying bond for certain reasons stated in such
petition; that thereafter such proceedings were had that the
petitioners were released and the contract was awarded to
Cooper & Burke for the sum of $300,000; and that Crilley &
O'Donnell were released without payment or consideration.
While proceedings for release were pending, O'Donnell filed
an affidavit with the city council, in which he set forth that
he had not signed or authorized any one to sign the petition
asking for relief, and did not know of its existence until Jan-

uary 31, 1898, and that on February 2d following he was
informed by Crilley that he had an agreement with the Wisconsin Rendering Company by the terms of which said Crilley was to receive $12,000 from the Wisconsin Rendering
Company as soon as the contract was awarded on the Cooper
& Burke bid; that in connection with said affidavit O'Donnell
filed with the city. council a communication stating that he
was ready to carry out said contract according to the terms of
the bid of Crilley & O'Donnell; that in pursuance of such
communication a committee of the common council was appointed to investigate said matter, and a large amount of testimony was taken in reference thereto; that evidence was offered tending to show. that the Wisconsin Rendering Company agreed to pay Crilley & O'Donnell the sum of $25,000
in the event of their failure to go on with the contract; that
the foregoing matters were published in the official proceedings of the common council and in the public press of the
city of Milwaukee, and were publicly known throughout said
city and the state of Wisconsin prior to August 6, 1905; that
aside from the report of the indictment and arrest of the
plaintiff, the published article, according to its true intent
and meaning, had reference only to the garbage contract transaction and the unlawful payments of money by the plaintiff
to Crilley.    The answer then proceeds to deny that the words
published meant or were intended to have the meaning attributed to them by the innuendoes of the complaint.

The second defense interposed pleaded the same matter by
way of justification that was contained in the first defense.

The third defense adopted the averments of the first defense, and further alleged that, while the proceedings were
pending before the common council of the city of Milwaukee
with reference to the letting of the garbage contract, plaintiff,
together with the Wisconsin Rendering Company and John
J. Crilley, combined, confederated, and agreed together to
defraud the city of Milwaukee out of the sum of $25,500 by

bribing said Crilley not to make good his bid and to refuse to enter into said contract, by the payment to said Crilley of a large sum of money, and thereafter and thereby procuring said contract to be let to the Wisconsin Rendering Company on the bid of Cooper & Burke; that in pursuance of such conspiracy the Wisconsin Rendering 'Company delivered to the plaintiff the sum of $25,000 in money, under an agreement with plaintiff and Crilley that, if Crilley & O'Donnell would not comply with their bid, the plaintiff would pay to said Crilley the sum of $15,000 out of the amount so deposited, and that if in consequence of said default the said contract should be awarded to the Wisconsin Rendering Company on the bid of Cooper & Burke, the plaintiff would pay to said Crilley the full sum of $25,000. The answer then alleged that Crilley did default; that he was paid by plaintiff for making such default the sum of $15,000; and that the contract for disposing of the garbage was awarded to the Wisconsin Rendering Company on the bid of Cooper & Burke. The answer further alleged, on information and belief, that the plaintiff at all times had knowledge of the unlawful and fraudulent character of the transactions aforesaid and participated therein with such knowledge, and that he paid over said money to Crilley as a bribe to induce him to default on his contract.

The separate answers interposed to the other causes of action were substantially the same as those pleaded in defense of the first cause of action set out in the complaint.

The general defense to all of the causes of action in mitigation of damages set out in detail the transaction in reference to the letting of the garbage contract. It also alleged that the plaintiff was a director in the Milwaukee Electric Railway & Light 'Company and in the Milwaukee Heat, Light & Traction Company, and that on May 26, 1899, there was verified by the mayor of Kenosha, and thereafter filed in the office of the clerk of the circuit court for Kenosha county, an an-

·swer in a certain suit, the contents of which answer were published in the public press prior to the publication of the articles complained of; that such answer set forth, on information and belief, that the vote in favor of the passage of a certain ordinance passed by the common council of the city of Kenosha, granting a franchise to the Milwaukee, Racine & Kenosha Railway Company, was procured by either giving or promising to give to the members of the common council voting in favor of said ordinance, or some of them, either money or things of value; that the Milwaukee Light, Heat & Traction Company actually participated in such corrupt action; and that the plaintiff was active in the management of said corporation and had full knowledge of its affairs.   Such defense also set forth that during the year 1901 the Milwaukee Electric Railway & Light Company was engaged in negotiations with the county of Milwaukee for the purchase of a parcel of land from said county for the purpose of erecting a power house thereon; that for the purpose of bringing about said purchase said company unlawfully and corruptly agreed to pay one August Puls, a supervisor of Milwaukee county, the sum of $750 as a bribe, for the purpose of influencing his vote on the sale of said real estate, and did in fact pay said sum to said Puls after he had voted in favor of making such sale; that the plaintiff, with knowledge of the corruption and as director of said corporation, retained and still retains such property, and, through a newspaper owned and published by him, ratified and approved of such corruption and bribery and discouraged and discountenanced all efforts to uncover or prosecute the same.   The answer alleges substantially the same facts in reference to the corruption of Otto Siedel and Edward F. Strauss, members of the county board of Milwaukee county, in reference to the same transaction.   The answer further sets forth that in the year 1901 plaintiff became prominent in a political organization known as the "Eleventh Floor League," and that said league received from the plaint-

iff large sums of money to be used for the purpose of purchasing the support and influencing the opinions of country newspapers, and that various editors and owners of country newspapers entered into a contract with said league for the purpose of deceiving the electors of Wisconsin and of corrupting the electors of the state, and that plaintiff aided and advised said league in so doing and contributed more than $30,000 for the unlawful purpose aforesaid. The answer further contains various allegations tending to show that the Milwaukee Electric Railway & Light Company corruptly used money for the purpose of securing a franchise from the city of Milwaukee, that plaintiff was actively identified with the management of said corporation, and that the corrupt practices resorted to were employed with his knowledge and consent. The answer further alleged that plaintiff aided, countenanced, and advised one Fred C. Schultz to pay money to Herman J. Pomrenning, a member of the Assembly for the state of Wisconsin, to induce him to vote in opposition to a bill pending before the legislature of the state of Wisconsin in the year 1901, which bill was entitled "A bill to provide for political nominations by direct vote."

The answer of the defendant *Myrick* did not set up any plea in mitigation. It pleaded substantially the same facts in justification that were pleaded by his codefendant the *Milwaukee Free Press Company.*

A defense was set up in the original answer which was denominated a third defense to each of the causes of action set out in the complaint. A demurrer thereto was sustained. The allegations thereof which are material to a consideration of the ruling of the court on the demurrer will be found in the opinion.

The trial court excluded evidence tending to show that plaintiff was connected with the Crilley & O'Donnell garbage transaction and also all evidence tending to show that the Milwaukee Electric Railway & Light Company or the Milwau-

kee Light, Heat & Traction Company had been guilty of bribery or other criminal acts in connection with the procurement of franchises or the purchase of the power-house site from Milv ikee county, and also all evidence tending to show the other alleged nefarious transactions with which the general answer in mitigation of damages alleged that the plaintiff had been connected. The trial resulted in a general verdict in plaintiff's favor for $10,000 compensatory damages and $5,000 punitory damages. From judgment rendered on such verdict the defendants appeal.

For the appellants there were briefs by *Edward M. Hyzer* and *W. E. Black,* and oral argument by *Mr. Hyzer* and *Mr. John J. Cook.*

For the respondent there was a brief by *Quarles, Spence & Quarles, Thomas M. Kearney,* and *Spooner & Ellis,* attorneys, and *George Lines,* of counsel, and oral argument by *Mr. Kearney* and *Mr. Lines.*

BARNES, J. 1. A third defense was originally pleaded to each of the causes of action contained in the complaint, to which a demurrer was sustained. Such defense set forth that the defendant corporation was a citizen and taxpayer of the city of Milwaukee, and that as such it was privileged to discuss and criticise governmental affairs, and public graft and dishonesty in municipal contracts, and also to discuss indictments and proceedings in court and to bring the same to the attention of the electors and taxpayers of the state; that in the exercise of such right the defendant published the matters and things set forth in the various causes of action alleged in the complaint; that the plaintiff was indicted as alleged in the complaint, and that plaintiff claimed and caused to be published a statement to the effect that he had received money from the Wisconsin Rendering Company, but disposed of it as directed by said company; that it was publicly and generally known, and the fact was, that said company

had been in negotiation with the city of Milwaukee for a contract for the disposal of its garbage, and that charges of bribery and corrupt conduct were freely made in the public press and elsewhere, during the latter part of the year 1897 and the early part of the year 1898, with reference to said contract, and that an investigation had been conducted by a committee of the common council in reference thereto, at which a large volume of testimony was taken; that it was generally understood, and the fact was, that the Wisconsin Rendering Company had been engaged in corrupt practices with reference to its contracts with the city of Milwaukee; that when the indictment was returned by the grand jury, and the attempted justification of the charge therein contained was made public by the plaintiff and was delivered to the defendant for publication, the defendant, without malice, and in the exercise of its right and privilege as a citizen and taxpayer of said city to expose, discuss, and condemn public corruption of every kind in public and municipal contracts, and not otherwise, and in the exercise of its right to criticise the pretended justification of the plaintiff, printed and published the articles complained of.

In reference to the ruling of the court sustaining the demurrer to this defense the appellants make two contentions: (1) That it was good as a plea of privilege; and (2), if not, it was good as a plea in mitigation of damages. It seems clear that the plea was one of privilege. It was so expressly denominated. The defendant corporation, as a citizen, claimed the right to discuss questions of public graft and kindred questions. It asserted that in the exercise of such right, and not otherwise, it published the articles in question. Having specifically pleaded the matter contained in the answer as a defense of privilege, it should be bound by its pleading in that respect. Affirmative proof of mitigating circumstances cannot generally be given in evidence without having been specially pleaded. *Reiley v. Timme,* 53 Wis. 63,

10 N. W. 5; *Wilson v. Noonan,* 35 Wis. 321; *Langton v. Hagerty,* 35 Wis. 151; *Hacker v. Heiney,* 111 Wis. 313, 318, 87 N. W. 249.  Neither do we think the defense of "privilege" or "fair criticism and proper comment" was permissible in this case.  The plaintiff held no office and was not a candidate for any.  Neither did he belong to any class which by seeking and inviting public patronage renders itself amenable to public comment and criticism which could not rightly be applied to a private citizen.  It appears that the plaintiff is a private citizen, and a false and defamatory publication concerning such a one is not privileged merely because it may relate to some public matter.  *Werner v. Ascher,* 86 Wis. 349, 56 N. W. 869; *Buckstaff v. Hicks,* 94 Wis. 34, 68 N. W. 403; *Burt v. Advertiser N. Co.* 154 Mass. 238, 28 N. E. 1; *Park v. Detroit F. P. Co.* 72 Mich. 560, 40 N. W. 731.

The case of *Davis & Sons v. Shepstone,* L. R. 11 App. Cas. 187, 190, states the rule thus:

"It is one thing to comment upon or criticise, even with severity, the acknowledged or proved acts of a public man, and quite another to assert that he has been guilty of particular acts of misconduct.  In the present case the appellants, in the passages which were complained of as libelous, charged the respondent, as now appears without foundation, 'with having been guilty of specific acts of misconduct, and' then proceeded, on the assumption that the charges were true, to comment upon his proceedings in language in the highest degree offensive and injurious; not only so, but they themselves vouched for the statements by asserting that, though some doubt had been thrown upon the truth of the story, the closest investigation would prove it to be correct.  In their lordships' opinion there is no warrant for the doctrine that defamatory matter thus published is regarded by the law as the subject of any privilege."

This rule is approved by the Massachusetts court, and would seem to be particularly applicable to the facts in the case under consideration, even if it were conceded that the plaintiff was a public character.  The appellant relies on the

cases of *Dakhyl v. Labouchere,* 77 L. J. K. B. 728; *Hunt v. Star N. Co.* 77 L. J. K. B. 732; and *Coleman v. MacLennan* (Kan.) 98 Pac. 281, as holding the contrary rule. The publication in the *Hunt Case* involved the official conduct of a public officer. In the *Coleman Case* the plaintiff was holding a public office and was a candidate for re-election when the article sued on was published, and the criticism complained of went to his fitness for the office. The libelous publication in *Dakhyl v. Labouchere* involved the capacity and ability of a physician who was soliciting patronage from the public. All of these cases, it seems to us, present a different principle from that involved in the present case.

2. The answer interposed contained allegations to the effect that the Milwaukee Sentinel, a newspaper owned by the plaintiff, published the indictment returned against him, together with the statement made by plaintiff in reference thereto, as well as other incidents in reference to the transaction, quite similar to the matter published by the defendant corporation, and also that like items were published in all the Milwaukee newspapers and in all the Chicago papers circulating in Milwaukee. On plaintiff's motion the foregoing allegations of the answer were stricken out, and such ruling is assigned as error. The courts generally hold that evidence of this character is improper and cannot be received in reduction or in mitigation of damages. *Palmer v. Matthews,* 162 N. Y. 100, 56 N. E. 501; *Wilson v. Fitch,* 41 Cal. 363; *Sheahan v. Collins,* 20 Ill. 325; *Gray v. Brooklyn U. P. Co.* 35 App. Div. 286, 55 N. Y. Supp. 35; *Tucker v. Lawson,* 2 T. L. Rep. 593; *Enquirer Co. v. Johnston,* 72 Fed. 443; *Sun P. & P. Asso. v. Schenck,* 98 Fed. 925. We do not hold that a defendant may not show in mitigation of damages that a libelous article was copied from another newspaper and published under the belief that it was true. Such evidence is held to be admissible. *Palmer v. Matthews, supra.* Here the portion of the pleading stricken out, at best, simply

showed that other articles of like tenor and effect to those
published in the Free Press were also published in other
papers.   This does not present the question that is presented
where a publisher shows that the article complained of was
quoted from another publication and published because it was
believed to be accurate.

3. After the plaintiff was indicted he purchased certain
past-due notes of the Wisconsin Rendering Company and
commenced action thereon.   In connection with such suit a
statement was given to the public press by the attorneys for
the plaintiff to the effect that, if plaintiff had stolen any
money belonging to the Wisconsin Rendering Company, the
conversion of the money might be pleaded as a defense and
the plaintiff's cause of action defeated.   Certain articles
were published by the defendant corporation charging in ef-
fect that the suit was not begun in good faith, but on the con-
trary was begun to befog the people and to intimidate wit-
nesses and by unfair means to secure access to the evidence
taken before the grand jury.   On the trial the plaintiff was
permitted to show that a civil suit was begun, and that the
Wisconsin Rendering Company interposed no answer therein,
but paid to plaintiff the amount sued for, with costs.   It is
urged that it was error to admit such evidence.   The defend-
ants pleaded the truth in justification.   It was not incumbent
on the plaintiff to negative the truth of the charges made by
offering evidence tending to establish the *bona fides* of the
transaction.   If he saw fit to assume that burden it is diffi-
cult to see how the defendants were prejudiced thereby.   It
is also urged that, the plaintiff having been permitted to offer
evidence in relation to this suit, the defendants should have
been permitted to go into the Crilley & O'Donnell transac-
tion.   It is a sufficient reply to this to say that the plaint-
iff did not open up the Crilley & O'Donnell transaction by
offering this evidence.   The position of the plaintiff was
that he had been indicted for stealing a large sum of money;

that he had commenced a civil suit against the party from whom it was alleged he had stolen, and the opportunity was now afforded such party to establish such theft and thus avoid paying the amount of the notes sued on. Manifestly, evidence tending to show that the money was paid to buy off Crilley & O'Donnell, at the request of the Wisconsin Rendering Company, was not invited by the evidence offered by the plaintiff, and neither was the door opened for its admission.

4. The plaintiff by innuendo alleged that certain of the articles published of and concerning him charged him with having committed larceny by stealing the sum of $14,000 from the Wisconsin Rendering Company, and that certain other articles accused him of committing said offense of larceny, or with having committed the crime of bribery by using said sum of money to corrupt members of the common council of the city of Milwaukee. The complaint further alleged that the readers of the newspaper placed the same meaning on the articles that was attributed to them by innuendo in the complaint. The answer denied that the publications were intended to mean or were in fact understood to mean that the plaintiff was guilty of bribing members of the common council, and alleged affirmatively that such articles were intended to mean and were understood by the readers of the paper to mean that the plaintiff had committed bribery in a colloquial sense by buying off the firm of Crilley & O'Donnell from carrying out its contract with the city and thus enabling the Wisconsin Rendering Company to secure the garbage contract at a higher figure. The defendants sought to prove the transaction by which the Wisconsin Rendering Company placed the sum of $25,000 in the hands of the plaintiff to be used by him as directed by said company, and also offered to prove that pursuant to a prearranged agreement between the rendering company, Crilley, and the plaintiff, Crilley did default in his contract, and for so doing was paid a large portion of the

money deposited with the plaintiff, and that in consequence
of such action the city of Milwaukee was obliged to let the
contract for about $25,000 more than the Crilley & O'Donnell
bid, and that the rendering company secured the contract.
The defendants contended that such transaction should be
placed before the jury so that it might be able to say whether
the crime of bribery of the common council was charged in
certain of the articles, as alleged in the complaint, or whether
bribery in a colloquial sense, in connection with the Crilley
transaction, was charged, as alleged in the answer. In con-
nection with its offer of evidence pertaining to the Crilley
matter the defendants offered to show that it was a subject
of public investigation and occupied a large amount of space
in the newspapers at the time, and was a matter of general
public discussion.

The trial court rejected all evidence relating to the Crilley
transaction. It also held that the articles published did not
directly charge the plaintiff with having committed the crime
of bribery of the common council, but that they were suscep-
tible of such meaning, and that it was for the jury to say
whether or not such was their true meaning. The court fur-
ther held that it was not permissible to aver in the answer that
the plaintiff was guilty of an offense different from that re-
ferred to in the complaint and then allege, virtually, by in-
nuendo, that the language used in the published article re-
lated to the offense set out in the answer. The view of the
trial judge was that the complaint charged bribery of the
common council, and, if such charge was not made in the
articles, there could be no recovery, and it was immaterial
what crime was in fact charged.

It seems to us that the trial court adopted a rule that was
unduly restrictive upon the defendants. If the language
used was susceptible of the meaning attributed to it by the
answer, it is difficult to see why the defendants were not pre-
cluded, under the ruling of the court, from establishing their

defense of justification. Assuming that the answer placed the proper meaning upon some of the articles, and that defendants could prove the truth of the charge made, their defense of justification would be established. Where an article is placed before a jury, in reference to which the complaint avers that it charges a certain crime, and the jury is told by the court that the language is susceptible of being so construed, and the defendant is precluded from showing that a different meaning should be attributed to it, from a practical point of view very little is left in the way of a defense. Take the case of a doctor, concerning whom it is published that he has killed a patient by malpractice. He alleges that the article intended and was understood to mean that he killed one Smith, a patient of his, who recently died. Cannot the publisher defend by saying that he did not charge the killing of Smith, and that the article was ñot so understood by the readers of the paper, but that he did mean to charge that the doctor had killed Jones, another patient of his, by malpractice, and that the article was generally understood to involve such a charge, and that it was true. If he cannot, and the court tells the jury that the article is susceptible of the meaning attributed to it in the complaint, the only defense the defendant can make is one by way of argument, not supported by any evidence except the article itself.

The case of *Dufresne v. Weise*, 46 Wis. 290, 295, 1 N. W. 59, may be said to support in some measure the view of the trial court, although the discussion in that case is to the effect that the defendant cannot, in an action for slander, plead and prove that language was used different from that charged in the complaint. That case did not hold that a defendant might not plead and prove that the words used had a different meaning from that attributed to them in the complaint. Here there is no dispute about the language actually used. The case of *Bremridge v. Latimer*, 10 L. T. Rep. 816, supports the view of the circuit judge. In that case it is held that a

defendant may not impute to words a meaning different from that charged in the innuendo and then seek to justify by showing the truth of the intended meaning. The contrary rule seems to be held in Michigan. *Bathrick v. Detroit P. & T. Co.* 50 Mich. 629, 16 N. W. 172. We think that the adoption of the rule followed by the circuit court might, from a practical standpoint, operate to deprive a defendant of a meritorious defense, and for that reason we cannot approve of it. It is true that courts should be careful about permitting evidence of extraneous matters, calculated generally to heap contumely on the plaintiff, to be received. It is only when it is reasonably clear that the language used is susceptible of the meaning attributed to it in the answer, and that the jury may infer that it was so understood by a respectable number of the readers of the paper, that proof should be permitted such as the defendants attempted to offer here.

The principal contention made by counsel for the respondents is that the language used in the articles complained of was not reasonably susceptible of the meaning placed thereon by the answers of the defendants, and that therefore the court was right in excluding the evidence sought to be introduced under the answers; and the correctness of the ruling of the trial court must be sustained on this ground, if sustained at all.

The article complained of in the first cause of action related principally to the charge of larceny contained in the indictment returned by the grand jury. However, some references were made therein to briberies practiced by the plaintiff. One of the headlines read: *"Pfister* was to engineer 1901 contract." The article recited that he was "charged with stealing $14,000 given him by the Wisconsin Rendering Company for the purpose of getting through the council a contract for the disposal of the city garbage *in the year 1901."* The article further recited:

"The facts as stated in the indictment show that he accepted from the Wisconsin Rendering Company the sum of

$14,000 to use in securing for the company the city garbage disposal contract to be let by the common council in the spring of 1901."

The article further set forth that lawyers, in discussing the indictment,

"claimed that as the true bill recited specifically that *Mr. Pfister* received the money with the understanding that he was to return it, if not used for the purposes for which it was given, he had placed himself in a position where he would have to admit bribery if he made good his contention that he had 'disbursed it years ago' as directed by Mr. Gross and admitted by *Mr. Pfister.*"

We are unable to see how this article could be understood by the readers of the paper to refer to the Crilley transaction. That took place during the latter half of the year 1897 and the early part of the year 1898. The article expressly stated that the plaintiff was to "engineer the 1901 contract" in reference to which the Wisconsin Rendering Company was negotiating with the city of Milwaukee, and that the plaintiff was charged in the indictment with stealing $14,000 which was given him for the purpose of securing the garbage contract that was to be let by the common council in the spring of 1901. The statement attributed to certain attorneys would naturally be understood by readers of the paper to refer to the 1901 transaction. The conclusions that would naturally be drawn from the portions of this article which relate to the subject of bribery would be that the plaintiff was to "engineer the 1901 contract" between the city and the Wisconsin Rendering Company; that he received $14,000 to be used in securing this contract; that he did not pay the money back to the Wisconsin Rendering Company; and if he did not steal it as alleged in the indictment, he used it for the purpose for which it was given him, to wit, to secure the 1901 contract from the city.

The article upon which the second cause of action is based was published on the day following. One of the headlines

asked the question, "For what purpose was $8,000 disbursed?" The article then proceeds:

"Who got the $14,000 *Charles F. Pfister* 'disbursed' for the Wisconsin Rendering Company? What was that much money 'disbursed' for, and why should *Mr. Pfister* have been made the disbursing agent? Or if, as Charles Quarles, *Mr. Pfister's* attorney, says, *Mr. Pfister* 'disbursed' $8,000 of the $14,000 under the direction of F. C. Gross, president of the Wisconsin Rendering Company, who got the $8,000? Who got the money *Mr. Pfister* 'disbursed' is what the grand jury wants to know. . . . *Mr. Pfister* was indicted because the grand jury had abundant evidence, direct and unimpeachable, that *Mr. Pfister* did get the $14,000 for the purpose of getting through the council a contract for the disposal of city garbage. One of two conclusions was inevitable: Either *Mr. Pfister* kept the money and converted it to his own uses or he used it in securing the adoption of the resolution letting the contract to the Wisconsin Rendering Company. The grand jury had no proof at the time it returned the indictment that *Mr. Pfister* committed bribery. It did have plenty of evidence that he accepted $14,000 from the rendering company, and that he did not return it to the Wisconsin Rendering Company as it was agreed he should if it was not used. Therefore he was indicted for larceny as bailee."

"Now *Mr. Pfister* not only admits that he 'disbursed' the money, but he stoutly insists that he disbursed it as directed by *Mr.* Gross. To whom did he 'disburse' it? *Mr. Pfister* did not tell. . . . Everywhere the pertinent question was asked: 'Where, how, and when did *Mr. Pfister* "disburse" the money, which he not only admits having done, but insists that he did so disburse?' *Mr. Pfister* would give no answer to the question. Mr. Quarles, as attorney for *Mr. Pfister,* was asked the same question. He replied: 'How did *Mr. Pfister* distribute it? I do not know. I do not know who got it. For the purposes of the case it is sufficient that he did distribute it, as directed.'"

The article further recited that lawyers and business men "called attention to the fact that the indictment showed plainly that the grand jury had indicted *Mr. Pfister* for larceny, because, while it might have suspected that *Mr. Pfister*

used the money to corrupt the council, it had no evidence to that effect, but did have abundant evidence that *Mr. Pfister* received the $14,000 and that he did not return it as agreed."

There is nothing in this article that is calculated to carry the mind back to any transaction that occurred in 1897. It is true that the date "1901" is not used in this article, as it is used in the preceding article, but the charge of bribery is interwoven with the charge of larceny as contained in the indictment, and the indictment stated that larceny was committed in 1901. Aside from this, the natural inference to draw from the article would be that the plaintiff was indicted for the crime of larceny, rather than that of bribery, because there was evidence before the grand jury to show that larceny was committed during the year 1901, as alleged in the indictment, whereas there was no evidence to show that bribery had been committed. Furthermore, the article stated that the evidence was plain that *Mr. Pfister* got $14,000 for the purpose of getting through the council a contract for the disposal of city garbage, and there is no suggestion in the article that the money was used for any other purpose. Of course, the purchase of Crilley might have a more or less direct bearing upon the matter of getting through the common council a contract in favor of the Wisconsin Rendering Company. But if such was the charge which it was intended to make, it is difficult to perceive why it was covered up in the manner in which it was, or why the article should have stated that the money was used to get a contract through the council. It seems to us that the ordinary reader of the paper would reach the conclusion, without any hesitation, that, if bribery in any sense was charged, it was charged by saying that the plaintiff used the money to buy members of the common council to vote for the contract. It may be conceded that the Crilley transaction was a matter of public notoriety at the time it transpired, but nearly eight years had elapsed between the time that transaction took place and the time the article was published, and

it appeared that in the meantime the Wisconsin Rendering Company was negotiating other contracts for the disposal of garbage.

The article upon which the fourth cause of action was based was also published on the 6th of August, and contained the following statements in reference to the charge of bribery made against the plaintiff:

" 'How did *Mr. Pfister* distribute it ?' said Mr. Quarles, his attorney, in reply to a question. 'I do not know. I do not know who got it. For the purposes of the case it is sufficient that he did distribute it, as directed.' . . . The people of Milwaukee want to know what *Mr. Pfister* did with the $14,000 placed in his hands for the purpose of securing from the common council a valuable contract for the Wisconsin Rendering Company. *Mr. Pfister* says he received the money from President Gross of the rendering company and that he disbursed it as Gross directed. He does not say how or to whom. *Mr. Pfister's* attorney says it is a matter of no consequence. Neither *Mr. Pfister's* statement nor that of his lawyer will satisfy the public. Who got the $14,000 ? "

It will be observed that in this article again the inquiry is made as to what *Mr. Pfister* did with the $14,000 placed in his hands for the purpose of securing from the common council a valuable contract for the Wisconsin Rendering Company. No reference is made to the Crilley & O'Donnell transaction, but the fact that the money was to be used in securing a contract from the common council prominently appears in the article. If the article is not susceptible of meaning that the money was used for the purpose of corrupting members of the common council, we certainly do not think it would be understood to mean, or would be reasonably susceptible of meaning, that eight years before money was placed in the hands of plaintiff to buy off a competitor of the Wisconsin Rendering Company.

The only other material reference to the question of bribery is contained in an article published August 8th, which is made

the basis of the seventh cause of action.    This article is more
indefinite as to the nature of the bribery charge.    The article
recited that *Mr. Pfister* in his statement said that

"about eight years ago he received from the officers of the
rendering company money for disbursement as directed by
President Gross of the company, and that he disbursed some
of it, and returned the remainder 'years ago.'    And when Mr.
Charles Quarles . . . was asked how *Mr. Pfister* distributed
the money he answered: 'How did *Mr. Pfister* distribute it?'
I do not know.   I do not know who got it.   For the purposes of
the case it is sufficient that he did distribute it, as directed.'
Mr. Quarles may be satisfied and *Mr. Pfister* may be satisfied
that it makes no difference to *Mr. Pfister,* or to the public,
how *Mr. Pfister* distributed this money or 'who got it.'   They
may not care what the public thinks; but they may as well
understand that it is thinking.    It thinks it knows how the
money was distributed."

The complaint alleges by way of innuendo that the lan-
guage quoted meant and insinuated that the plaintiff used
said money for the purpose of bribing city officials of the city
of Milwaukee.

The defendants could not attribute some recondite meaning
to the words used which the readers of the article would not
be apt to discover and then proceed to justify on the basis of
such meaning being the true one.    Neither is the meaning in-
tended by the writer of an article important, unless such
meaning is the natural and obvious one and the meaning
that would be conveyed to the readers of the article generally.
Townshend, Slander & L. § 139; *Montgomery v. Deeley,* 3
Wis. 709; *Wilson v. Noonan,* 23 Wis. 105, 107; *Filber v.
Dautermann,* 26 Wis. 518, 520; *Weil v. Schmidt,* 28 Wis.
137, 141; *Eviston v. Cramer,* 47 Wis. 659, 660, 3 N. W.
392; *Bradley v. Cramer,* 59 Wis. 309, 312, 18 N. W. 268;
*Cochran v. Melendy,* 59 Wis. 207, 18 N. W. 24; *Singer v.
Bender,* 64 Wis. 169, 172, 24 N. W. 903; *Solverson v. Peter-
son,* 64 Wis. 198, 202, 25 N. W. 14; *Guth v. Lubach,* 73 Wis.
131, 136, 40 N. W. 681; *Pandow v. Eichsted,* 90 Wis. 298,

300, 63 N. W. 284; *Dabold v. Chronicle P. Co.* 107 Wis. 357, 83 N. W. 639.

So much of the foregoing article as pertains to the charge of bribery consists substantially in repeating the inquiry contained in the former articles,—Who got the money? A reading of this article, in connection with the articles preceding it, would clearly indicate that it was not intended to relate to the 1897 transaction, but was intended to relate to the 1901 transaction. Considering the article by itself, its meaning would be more obscure. But if this article is segregated from the other articles published, we do not think it charges bribery at all or that it could be made to do so by innuendo. The innuendo may explain, but it cannot enlarge, the meaning of the words used. It is only when this article is read in connection with the series of articles which preceded it that it can be held to charge bribery in a colloquial sense or in any other sense. For this reason we think the court did not err in excluding evidence of the Crilley transaction in reference to this article.

5. The court charged the jury as follows:

"To maliciously print and publish of and concerning a man that he has been guilty of a crime is a libel, if the charge is false. It is also a libel to maliciously print and publish false statements concerning a man which tend to degrade or disgrace him or subject him to degradation, contempt, or ridicule."

It is urged that by this charge the court submitted to the jury for assessment of damages a libelous charge which did not impute the commission of a crime, and that it was therefore error for the court to exclude evidence offered by the defendants which might minimize the damages that would otherwise be assessed against them, or perhaps constitute a defense to the causes of action brought on publications which did not charge a criminal offense. It is not seriously contended that the instruction was not in itself correct. The complaint set forth several libelous articles which did not

charge a crime. One article charged that plaintiff had mere-
tricious objects in view in purchasing the Milwaukee Sen-
tinel, one such object being to suppress a suit which might
be damaging to his reputation. Another article charged that
the purpose in bringing suit against the Wisconsin Rendering
Company was to befog the public and divert attention from
the real controversy, and it was likewise charged that one
purpose plaintiff had in view in bringing such suit was to
intimidate witnesses for the state in the criminal prosecution.
He was likewise charged with intent to improperly secure the
evidence upon which the grand jury acted. The portion of
the charge above quoted, referring to acts which did not in
themselves constitute crimes, was proper enough in view of
the fact that several of the articles set out in the complaint
did make libelous charges without actually accusing the
plaintiff of a crime. We do not understand that any material
evidence was rejected which would tend to prove the truth
of the statements in the articles which contained libelous
matter but did not charge the commission of a felony, and we
fail to see where the court erred in giving this portion of the
charge.

6. It is further urged that the court erred in excluding
evidence tending to show the public notoriety of the so-called
1897 garbage transaction. If the language complained of
was reasonably susceptible of being understood to refer to
such transaction, then it would be very proper to show that it
was a matter of common knowledge or public notoriety. If a
large number of the readers of the paper were conversant
with the facts in reference to the Crilley deal and understood
one or more of the articles to refer thereto, and the facts were
proved as alleged in the answer, the defense of justification
would be at least partially established as to such charge. It
is manifest that, if one half of the readers of the paper un-
derstood the language to refer to a transaction that actually
took place, the plaintiff would not be injured to the same

extent that he would be wronged if all of the readers understood the articles to charge a crime of which he was not guilty. Having reached the conclusion that the articles could not reasonably be understood as referring to the 1897 garbage contract, evidence tending to show the notoriety of that transaction was immaterial. The evidence was not admissible as proof of mitigation. The defendants could not mitigate damages by showing specific acts of wrongdoing on the part of the plaintiff. Such evidence should be confined to the general bad character of the plaintiff and to legitimate proof tending to disprove malice. *Storey v. Early,* 86 Ill. 461; Newell, Libel & S. 890.

7. It is urged that the court erroneously excluded a portion of one of the alleged libelous articles, which reads as follows:

"When the question was asked, 'What did *Mr. Pfister* do with the money?' I was not inclined to believe that he had used it in bribing the council, for there are other and more insidious forms of corruption. Every man who knows anything about the bidding on and the letting of city contracts knows that sometimes money is used to buy off other bidders. I am not saying that *Mr. Pfister* used it in that way, but that might have been the way he used it."

The record fails to disclose that the quoted portion of the article was offered in evidence, hence it could not have been excluded.

8. After informing the jury that a corporation was a legal entity, and as such could have no malice towards any one aside from that of the party who represented it, the court said:

"The defendant *Mr. Myrick* was the corporation's employee, the managing editor of the paper, and responsible for the articles published in it; and your only inquiry on this branch of the case is, Was *Mr. Myrick* actuated by malice in having the article published? If he was, punitory damages may be assessed against both defendants."

The pertinent inquiry in connection with this instruction is, Was the court in error in imputing the malice of *Mr. My-*

*rick,* if any he had, to the corporation, as a matter of law? In a large number of cases it is held that exemplary damages cannot be recovered against the principal for the wrongful and malicious act of the agent, neither authorized nor ratified by the principal. *Milwaukee & M. R. Co. v. Finney,* 10 Wis. 388; *Craker v. C. & N. W. R. Co.* 36 Wis. 657; *Bass v. C. & N. W. R. Co.* 42 Wis. 654; *Patry v. C., St. P., M. & O. R. Co.* 77 Wis. 218, 46 N. W. 56; *Mace v. Reed,* 89 Wis. 440, 62 N. W. 186; *Robinson v. Superior R. T. R. Co.* 94 Wis. 345, 68 N. W. 961; *Bryan v. Adler,* 97 Wis. 124, 72 N. W. 368; *Vassau v. Madison E. R. Co.* 106 Wis. 301, 82 N. W. 152; *Gaertner v. Bues,* 109 Wis. 165, 85 N. W. 388; *Rueping v. C. & N. W. R. Co.* 116 Wis. 625, 93 N. W. 843. The same rule is adhered to in an action to recover damages for alleged libel. *Eviston v. Cramer,* 57 Wis. 570, 15 N. W. 760. The only case we are aware of that even suggests a contrary rule is *Allen v. News P. Co.* 81 Wis. 120, 50 N. W. 1093. The correctness of the instruction as a proposition of law depends upon whether the same rule should be applied where the malicious act is done by the officer of a corporation intrusted with the management of its business that is applied in the case of an ordinary agent or employee. We do not deem it necessary to decide such a question in this case.

We think the court might well have instructed the jury that, if it found *Mr. Myrick* was actuated by malice, his malicious acts were ratified if not authorized. Very broad powers were conferred on *Mr. Myrick* in respect to the management and policy of the newspaper. He had the immediate and active charge, management, and control thereof, as well as of all matters published therein. He had all the authority the corporation itself might exercise in determining what should be published and what should be excluded. It would be illogical to say that the governing body of the corporation, in conferring such power, intended that it should be abused. But, having conferred the power, the corporation could not escape liability by saying that no authority would be found

in the record of its proceedings empowering *Mr. Myrick* to libel any one, and neither would a ratification of any libel be found therein. The publication of these articles extended over a series of seven days. The paper was read by the directors of the corporation. Apparently no protest was made by any director against the publication of the articles, and no suggestion was made that such publications should cease, except that Mr. Upham found fault, in a general way, with the character of the journalism carried on by the Milwaukee papers. This action was not commenced for a month after the publications began, and in the interim no repudiation was made of the acts of *Mr. Myrick*. The action was not tried until more than two years after it was begun, but no retraction or repudiation of the publications was ever made by the corporation. On the contrary, it answered, alleging that the publications were true. While such pleading, when the defense fails, is not proof of malice under sec. 4201, Stats. (1898), it has some force as bearing upon the ratification of *Mr. Myrick's* acts. Finally, *Mr. Myrick* was continued in the employ of the corporation, without any curtailment of powers, down to the time of the trial. It would appear, from some of the decided cases at least, that this circumstance is in itself conclusive proof of ratification. *Bass v. C. & N. W. R. Co.* 42 Wis. 654, 677; *Patry v. C., St. P., M. & O. R. Co.* 77 Wis. 218, 227, 46 N. W. 56. The cases of *Robinson v. Superior R. T. R. Co.* 94 Wis. 345, 350, 68 N. W. 961, and *Cobb v. Simon,* 119 Wis. 597, 606, 97 N. W. 276, hold that it is evidence of ratification. However this may be, we think that in this case whatever malice the defendant *Myrick* was guilty of was also attributable to the corporation, by reason of the character of the authority given in the first instance, and by reason of the subsequent conduct of the corporation.

9. In reference to the article published on the morning of August 5th *Mr. Myrick* was asked: "Now, then, was that article published by you with any malice or evil intent toward

*Mr. Pfister?* " To which the witness replied: "None whatever." The witness was then asked what was the purpose and intention with which the article was published. What was his motive in the publication of the article? What was the purpose and intention of the publication of the other articles set out in the complaint? What was his motive in the publication of such articles? Were the facts and circumstances connected with the so-called garbage deal within his knowledge at the time the article of August 5, 1905, was published? Did the witness know according to common report that at or prior to August 5, 1905, plaintiff was connected with the so-called garbage deal? Did the witness know according to common report that the sum of $25,000 had been deposited with the plaintiff in the summer of 1897 for the purpose of buying off the firm of Crilley & O'Donnell from their contract in order to procure the contract for the Wisconsin Rendering Company? What did the witness know as to any effort being made in the summer of 1897 to buy off the firm of Crilley & O'Donnell from a contract for the disposal of garbage? And what did the witness know of any money paid by *Pfister* to Crilley for the purpose of disposing of the contract with the city for the disposal of garbage?

Objections were interposed to each of the foregoing questions except the first, and were sustained. The witness was permitted to expressly negative malice in reference to the publication of August 5th, and presumably would have been permitted to negative malice as to other publications had questions been propounded directly asking whether or not the defendant was actuated by malice in making such publications. It was proper to permit the defendant to testify that he was not actuated by malice or evil intent toward the plaintiff. *Wilson v. Noonan,* 35 Wis. 321; *Sherburne v. Rodman,* 51 Wis. 474, 8 N. W. 414; *Plank v. Grimm,* 62 Wis. 251, 22 N. W. 470. The rule as stated in Jones, Ev. (2d ed.) § 170, is that "whenever the motive, intention,

or belief of a person is relevant to the issue, it is competent for such person to testify directly upon that point, whether he is a party to the suit or not."

We do not think the court erred in refusing to permit the examination to extend further than to allow the defendant to make a direct and explicit denial of malice. Had the examination been allowed to proceed further, it is apparent that it would have raised a number of collateral issues. The defendant was asked as to whether common report connected the plaintiff with the garbage deal, and as to whether it was commonly reported that $25,000 had been deposited with the plaintiff for the purpose of buying off the firm of contractors, and other matters that might tend, in a measure, to support the testimony of the defendant to the effect that he was not actuated by malice, but which at the same time would bring into the case a number of side issues not properly there for any other purpose. Some of the questions, too, were objectionable on the ground that the answers thereto would at least have a tendency to place before the jury the defendant's construction of the language used in the libelous articles that were made the basis of the action. Such questions were clearly improper under the decision of the court in *Wilson v. Noonan, supra.*

10. Error is alleged because of the exclusion of the testimony taken before the grand jury. It is argued that the evidence was admissible in explanation, support, and justification of the matter set forth in the first and second causes of action in relation to testimony before the grand jury. The evidence could not be received to establish the fact that the plaintiff was guilty of larceny. The witnesses to prove such fact should be produced in court so that the plaintiff would have the opportunity of cross-examination.

The article which furnished the basis for the second cause of action set forth that:

"The grand jury had no proof at the time it returned the indictment that *Mr. Pfister* committed bribery. It did have

plenty of evidence that he accepted the $14,000 from the rendering company and that he did not return it to the Wisconsin Rendering Company as it was agreed he should if it was not used. Therefore he was indicted for larceny. as bailee."

A portion of the article upon which the first cause of action is based sets forth the names of the witnesses, and, to some extent, the character of the evidence produced before the grand jury and which resulted in the indictment. If it were charged as libelous to say that the grand jury acted on ample evidence, the testimony taken before it would be competent to prove that it did so act. What the plaintiff complains of in the first and second causes of action is that the defendant corporation used language that was capable of meaning, and was understood by the readers of the newspaper to mean, that plaintiff was in fact guilty of the crime of theft, or that, if he was not guilty of such offense, then he was guilty of the crime of bribery. The proof offered did not meet any charge that the plaintiff relied on to establish his case and was therefore, we think, correctly excluded.

11. The court instructed the jury as follows:

"And if it appears that *Mr. Myrick* has attempted, but failed, to prove the truth of any defamatory statement in any of the articles complained of, you may consider that fact as bearing also upon the question whether he was or not actuated by malice or ill will in publishing the statement."

The particular criticism made on this portion of the charge is that the court should have instructed the jury that an attempt to prove justification was not evidence of malice unless such attempt was made in bad faith. The following cases are cited in support of this contention: *Marx v. Press P. Co.* 134 N. Y. 561, 31 N. E. 918; *Willard v. Press P. Co.* 52 App. Div. 448, 65 N. Y. Supp. 73; *Upton v. Hume,* 24 Oreg. 420, 33 Pac. 810; *Distin v. Rose,* 69 N. Y. 122.

In New York it is held that where the answer sets up justification and the evidence fails to sustain the plea, such plea cannot be considered in enhancement of the plaintiff's dam-

ages unless it is interposed in bad faith. *Distin v. Rose, supra; Cruikshank v. Gordon,* 118 N. Y. 178, 23 N. E. 457. In *Marx v. Press P. Co., supra,* the court charged the jury that there was no evidence of malice save that shown by the publication of the article and the plea of justification, and it was held that the instruction was not erroneous; no request having been made to instruct the jury that, if the plea was interposed in good faith and not wantonly, no damages should be assessed because of its having been made. In *Willard v. Press P. Co.* 52 App. Div. 448, 65 N. Y. Supp. 73, it is held that an instruction which did not limit the jury to accepting as evidence of malice only such pleas as were interposed in bad faith was erroneous. Substantially the same doctrine is held in Oregon. *Upton v. Hume, supra.* All these decisions are made under statutes similar to our sec. 4201, which provides that a plea of justification, though not maintained by the evidence, shall not in any case be of itself proof of the malice charged in the complaint. It will be observed that the instruction of the court was directed to the evidence offered under the plea of justification and not to the plea itself. The statute provides that the answer itself shall not be considered proof of malice, even though it is not maintained. The court instructed the jury that if the defendants attempted, but failed, to prove the truth of the defamatory matter complained of, such fact might be considered as bearing on the question of ill will. The majority of the court is of the opinion that the charge was correct, and that an unsuccessful attempt at justification is a proper circumstance for the jury to consider in determining whether the defendant was actuated by malice. Personally, the writer of this opinion entertains the view that this construction of the statute is too narrow, and that where a defendant pleads, and attempts in good faith to justify, but fails to do so, such attempt should not be made the basis of aggravating the plaintiff's damages. Mr. Justice Siebecker also concurs in this

view. I should hesitate, however, to say that what I conceive to be the error of the court was of sufficient materiality to warrant a reversal of the judgment.

12. Nine causes of action were originally set out in the complaint. Three of these were discontinued before trial and proof was offered under the remaining six. The case was submitted to the jury on a general verdict. Such submission is alleged to be erroneous. We think that a general verdict may properly be returned in a case where a plaintiff seeks to recover on several different causes of action. The case of *Sletten v. Madison,* 122 Wis. 251, 99 N. W. 1020, relied on by the appellant, holds that such a verdict may be returned in some cases, but does not attempt to define what class of cases may properly be so submitted and what may not be. As a general proposition we see no objection to submitting a general verdict in such a case, where the jury can be properly instructed so as to protect the rights of the defendant and to avoid the objections that are generally urged against such a form of verdict in such a case. It is urged that a general verdict was improper in the instant case because some of the jurors might find for the plaintiff on one cause of action and others on different causes, and the verdict would not express the unanimous judgment of the jurors as to any particular cause of action. It is further urged that in the assessment of damages the verdict may be the result of widely variant opinions among jurors as to the amount that should be assessed on account of each particular one of the publications found to be libelous, while the aggregate result might meet the views of all. In the event of a submission such as was here made, the jury should, in substance and effect, be instructed that all jurors must be agreed to find for the plaintiff as to the existence of each alleged libel before any damages could be assessed on account of the same, and that all must be agreed as to the quantum of damages that should be assessed as compensation for such libel. Such is

the effect of the decisions of this court in *Boldt v. State,* 72
Wis. 7, 16, 38 N. W. 177; *Sletten v. Madison,* 122 Wis. 251,
99 N. W. 1020; and *Vogel v. State,* 138 Wis. 315, 119 N. W.
190. The question whether or not error resulted from the
submission of a general verdict depends upon whether the
court correctly instructed the jury. The verdict may have
been arrived at in a manner not subject to criticism. If the
instructions were correct, no error followed. If, by the in-
structions, the jurors were permitted to wander, and arrive
at different conclusions which produced the same result in
the aggregate, error was committed. It seems to us, how-
ever, that the error, if any, must be either due to the affirma-
tive language used in the charge as given or to the negative
action of the court in failing to properly caution the jurors
as to how they should proceed in reaching a verdict. This
court has uniformly refused to reverse judgments for errone-
ous instructions where no exception was taken thereto, and
has likewise refused to reverse judgments because of failure
to instruct where no request for instruction was made. A
general verdict being proper in this case, if accompanied by
appropriate instructions, we are unable to see how failure to
instruct, or error in the instructions given, should be treated
differently from like errors in the ordinary case. No de-
mand was made by defendant for a special verdict. No in-
struction was asked that was calculated to reach the point un-
der discussion, and, if error resulted, it must be because some
portion of the charge was erroneous to which exception was
taken. A careful reading of the charge fails to convince us
that any affirmative error was committed in giving it. There
is nothing in it that suggests that the jurors need not all
agree upon the particular libel, or the damages sustained by
reason thereof, before a verdict for the plaintiff might be re-
turned. Indeed, we think the language of the court very
fairly informed the jurors that all must be agreed upon the
existence of each specific libel and of the damages to be re-

turned in consequence thereof, or else the plaintiff could not recover on account of the same. It is true that the charge might be made a little more direct and specific upon this point, and that there is a mere possibility that it was not sufficiently explicit to avoid harm; but, under the decisions of this court, we think that in the absence of a request for more specific instruction no error was committed. *Lela v. Domaske,* 48 Wis. 623, 4 N. W. 794; *Weisenberg v. Appleton,* 26 Wis. 56; *Kelly v. Houghton,* 59 Wis. 400, 18 N. W. 326; *Newton v. Whitney,* 77 Wis. 515, 46 N. W. 882; *Nat. Bank v. Ill. & Wis. L. Co.* 101 Wis. 247, 77 N. W. 185.

13. It is urged that the damages are excessive and that the judgment should be reversed for that reason. We are unable to say that the amount of the recovery is such as to indicate passion or prejudice on the part of the jurors; and, under the rule adopted by this court as to when judgments will be reversed because of excessive damages, we do not think the judgment in the present case should be interfered with.

*By the Court.*—Judgment affirmed.

TIMLIN, J., took no part.